

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-7-1997

# United States v. Igbonwa

Precedential or Non-Precedential:

Docket 96-1848

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"United States v. Igbonwa" (1997). *1997 Decisions.* Paper 185.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/185

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

iled August 7, 1997

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 96-1848 / 97-1054

UNITED STATES OF AMERICA,
Appellant No. 96-1848

v.

FRANKLIN UZO IGBONWA
a/k/a Franklin Uzowa
a/k/a Francis Igwe
a/k/a Laz Igbonwa

UNITED STATES OF AMERICA,

v.

FRANKLIN UZO IGBONWA
a/k/a Franklin Uzowa
a/k/a Francis Igwe
a/k/a Laz Igbonwa

Franklin Igbonwa,
Appellant No. 97-1054

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
D.C. No.: 90-cr-00375

Argued April 17, 1997

Before: GREENBERG, ALITO, and ROSENN,
Circuit Judges.

(Opinion Filed August 7, 1997)

Michael R. Stiles,
 United States Attorney, Eastern
District of Pennsylvania
Walter S. Batty, Jr.,
 Assistant United States Attorney,
Chief of Appeals
Mark J. Ehlers,
 Assistant United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19606

Frank W. Hunger,
 Assistant Attorney General,
Civil Division
Francesco Isgro,
 Senior Litigation Counsel,
Office of Immigration Litigation
Karen Ann Hunold (argued),
 Office of Immigration Litigation,
Civil Division,
United States Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044
Counsel for Appellant/Cross-Appellee

R. David Walk, Jr. (argued)
Hoyle, Morris, & Kerr
One Liberty Place, Suite 4900
1650 Market Street
Philadelphia, PA 19103
Counsel for Appellee/Cross-Appellant

**OPINION OF THE COURT**

ROSENN, Circuit Judge.

This appeal stems from an unusual order of the United States District Court for the Eastern District of Pennsylvania, directing the "United States of America [to] take steps to prevent [Franklin Uzo Igbonwa's] deportation to Nigeria." Igbonwa, a Nigerian citizen who initially entered the United States in 1986 as a non-immigrant visitor for pleasure, was indicted by a federal grand jury and convicted in 1990 for drug violations. In a habeas corpus proceeding brought by Igbonwa in 1996, the district court found that despite a written plea agreement which made no reference whatsoever to his deportation, the Assistant United States Attorney (AUSA) orally promised, as part of the plea bargain, that Igbonwa would not be deported. The court directed that the United States take measures to prevent Igbonwa's deportation. The Government timely appealed. We reverse the order prohibiting deportation, but affirm the district court's denial of the defendant's motion for release on his own recognizance pending this appeal.

I.

Franklin Uzo Igbonwa is a Nigerian citizen who entered the United States in 1986 as a "non-immigrant visitor for pleasure." Immigration & Naturalization Service (INS) adjusted Igbonwa's status to that of conditional permanent resident in 1987 following his marriage to a United States citizen. In 1989, Igbonwa petitioned to remove the conditional element of his immigration status. INS denied his petition on November 29, 1989, when the agency determined that his marriage was a sham marriage entered into solely for the purpose of securing Igbonwa permanent resident status. INS began proceedings to terminate his conditional permanent resident status in 1990, but these proceedings were administratively halted on March 8, 1990, due to Igbonwa's incarceration on narcotics offenses.

In 1990, a federal grand jury indicted Igbonwa in the Eastern District of Pennsylvania on two counts of

3

possession with intent to distribute heroin, in violation of 21 U.S.C. § 841(a)(1). He negotiated a plea agreement with the United States Attorney's Office in Philadelphia. The agreement stated that Igbonwa would plead guilty to the two counts of the indictment and cooperate with the Government in future criminal investigations, in exchange for which the Government would file a motion recommending a downward departure under 18 U.S.C. § 3553(e) and United States Sentencing Guideline § 5K1.1 if it deemed Igbonwa's cooperation satisfactory. The plea agreement further provided that "no additional promises, agreements or conditions have been entered into other than those set forth in this document and that none will be entered into unless in writing and signed by all parties." The plea agreement made no references relating to deportation.

In accordance with the plea agreement, Igbonwa pled guilty on November 20, 1990. During his plea colloquy, Igbonwa averred that no additional representations or promises had been made and that he had not been induced to enter into the plea agreement by any promises beyond those in the written agreement. The court sentenced Igbonwa to nine years in prison on each count, the two sentences to run concurrently, and ten years of supervised release.1 In 1994, the Governmentfiled a Rule 35(b) motion recommending a reduction in Igbonwa's prison sentence for his cooperation and testimony in a criminal investigation conducted in the District of Maryland. The district court granted the motion and reduced Igbonwa's imprisonment by three years.

On August 5, 1993, INS began an investigation to determine whether Igbonwa was subject to deportation and served a detainer notice on the warden of the prison where Igbonwa was incarcerated. In August of 1995, INS initiated

---

1. At the time of his arrest, Igbonwa had previously been convicted in the Eastern District of Pennsylvania of conspiracy to commit offenses against the United States, false statements, and false use of a social security number. This previous conviction was relied upon in determining Igbonwa's criminal history for purposes of sentencing under the United States Sentencing Guidelines but is not a deportable offense under 8 U.S.C. § 1251.

4

deportation hearings against Igbonwa, and an immigration judge issued an order of deportation on October 5, 1995. Igbonwa finished serving his criminal sentence in December, 1995, and has remained in prison pending his deportation pursuant to the INS detainer notice.

In February, 1996, Igbonwa filed a motion in the district court for return of seized property, and at this time raised the issue of a promise allegedly made by AUSA Ronald Jarvis during the course of the plea agreement negotiations. Igbonwa asserted that the AUSA promised him the Government would not deport him if he cooperated in other heroin trafficking investigations. Igbonwa further asserted that he relied on AUSA Jarvis' promise when he agreed to enter into the plea agreement. Igbonwa further stated that an INS agent, Jim Martinelli, attended one of these plea negotiations between Jarvis and Igbonwa and, according to Igbonwa, basically stated that if the Government agreed not to deport Igbonwa, then INS would concur in that decision.

After conducting hearings on the issue, the district court found that the promise had been made, that the promise was enforceable, and that it must be enforced. Thus, the district court granted Igbonwa's motion for specific performance of the plea agreement entered into between the two parties and directed that the "United States of America shall take steps to prevent the defendant's deportation to Nigeria." The United States appealed from that order. Igbonwa filed a cross-appeal from the January 15, 1997 order of the district court denying his motion to be released on his own recognizance pending resolution of the deportation proceedings.

II.

A.

As a threshold matter, the Government contends that this court has no jurisdiction to hear this appeal and that the district court had no power to hear Igbonwa's motion in light of recent legislation designed to restrict the habeas corpus rights of an alien subject to an order of deportation. Congress, in accordance with its broad powers in matters of

immigration, limited the right of judicial review of deportation orders by passing the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), P.L. 104-208, 110 Stat. 3009 (1996). The IIRIRA, which became effective on April 1, 1997, states:

Except as provided in this section and notwithstanding any other provision of law, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from a decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this Act.

IIRIRA, § 306(a) (to be codified at 8 U.S.C.§ 1252(g)). This provision applies "without limitation to claims arising from all past, pending, or future exclusion, deportation, or removal proceedings under such Act." IIRIRA,§ 306(c)(1). Courts reviewing this statute have determined that"the IIRIRA removed the jurisdiction of the [federal courts] to hear habeas claims under all other federal statutes." See Charan v. Schiltgen, No. C 96-3061 FMS, 1997 WL 135938, at *3 (N.D. Cal. Mar. 18, 1997). Thus, the Government argues strenuously that this law abrogates the order of the district court and divests all federal courts, including this court, of current and future jurisdiction over Igbonwa's § 2255 motion.

In the alternative, the Government argues that the district court lacked subject-matter jurisdiction over Igbonwa's petition for habeas corpus relief because Igbonwa failed to exhaust his administrative remedies prior to the filing of this petition, as required by 8 U.S.C.§ 1105(a). The district court found that Igbonwa was not required to exhaust these remedies under Massieu v. Reno, 91 F.3d 416 (3d Cir. 1996), which permits judicial consideration of claims "that are not of the type intended to be reviewed under [the administrative scheme], especially if such claims could not otherwise receive meaningful review." Massieu, 91 F.3d at 422 (citing Thunder Basin Coal Co. v. Reich, 510 U.S. 200, 212 (1994)). These are claims which are"wholly collateral" to the administrative review process. Id. The Government argues that Igbonwa's challenge to the deportation order goes to the heart of the order-- the

6

authority of INS to issue this order -- and therefore this claim is not "wholly collateral" to administrative review. Thus, the Government asserts that the district court also lacked jurisdiction over Igbonwa's § 2255 motion because of his failure to exhaust all adminstrative remedies.

With due regard to the Government's argument, we need not resolve issues unnecessary to the disposition of this case. "[A] court need not reach difficult questions of jurisdiction when the case can be resolved on some other ground in favor of the same party." Georgine v. Amchem Products, Inc., 83 F.3d 610, 623 (3d Cir. 1996), aff 'd, 65 U.S.L.W. 4635 (June 25, 1997). In the present matter, we resolve the merits of the appeal in favor of the Government, who had raised the matter of jurisdiction. Therefore, we decline to address the jurisdictional issues raised by the Government in this case2 and proceed to an analysis of the district court's decision.

B.

A district court's factual findings are subject to the clearly erroneous standard of review. Fed. R. Civ. P. 52(a). Under this standard, a finding is "clearly erroneous when

_____

2. This case presents an unusual circumstance because we reverse the district court's order pertaining to deportation. Usually when we decide the merits of an appeal without reaching a jurisdictional issue, we affirm the district court's order. See, e.g. , United States v. Eyer, 113 F.3d 470, 474-75 (3d Cir. 1997). Thus, it could be said that in assuming jurisdiction we are not acting in favor of the party to whose benefit the objection to jurisdiction would redound. Id. at 474. After all, if we dismissed the appeal we would benefit Igbonwa if the dismissal meant that the district court's order would stand.

The foregoing analysis, however, is inapplicable here because the Government certainly does not contend that we should dismiss the appeal but allow the district court's order to remain. Rather, it contends that the federal courts have no jurisdiction over this case, an argument which, if accepted, would result in the district court order being vacated. Clearly, it is not in Igbonwa's interest that we take that position. Thus, we cannot view the jurisdictional issue as being limited to appellate jurisdiction. Accordingly, viewing the challenge to jurisdiction to relate to both the district court and this court, we are acting in Igbonwa's interest by taking jurisdiction or, at worst, not prejudicing him.

7

`the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " United States v. Bogusz, 43 F.3d 82, 85 (3d Cir. 1994) (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948)), cert. denied sub nom. O'Rourke v. United States, 115 S. Ct. 1812 (1995). This standard does not permit the reviewing court to conduct a de novo review of the evidence, but it does allow the court to consider whether there is enough evidence in the record to support the factual findings of the district court. Cooper v. Tard, 855 F.2d 125, 126 (3d Cir. 1988). This review is more deferential with respect to determinations about the credibility of witnesses, and when the district court's decision is based on testimony that is coherent and plausible, not internally inconsistent and not contradicted by external evidence, there can almost never be a finding of clear error. Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 575, 105 S. Ct. 1504, 84 L. Ed. 2d 518 (1985).

On this record, there is only one source of evidence that the alleged promise existed: Igbonwa. Only Igbonwa's testimony supports the existence of the alleged agreement; the district court relied on no other evidence. The court found that this promise had been made after determining that Igbonwa was an "intelligent, articulate man" who gave credible testimony. However, the same court had previously sentenced Igbonwa to a year above the recommended sentence after concluding that Igbonwa had not been candid with the court. In fact, at one earlier hearing, the court referred to Igbonwa as a "prevaricating, polygraph-flunking putative perjurer."

Additionally, Igbonwa's own testimony in this proceeding is marred by inconsistencies with prior assertions he made pertaining to this agreement and other matters related to his deportation. Igbonwa now asserts that the alleged promise was made during meetings he had alone with AUSA Jarvis, without the presence of counsel. However, Igbonwa sued his former counsel for legal malpractice in 1995, charging that his attorney conducted the plea negotiations without Igbonwa's knowledge or presence and that Igbonwa was not a party to the negotiations in any meaningful way. Additionally, at every point up until the

8

deportation order was executed, Igbonwa continued to acknowledge that the only terms of the plea agreement were those contained within the written document and that there were no additional terms.

The district court concluded that "Mr. Igbonwa's testimony is not a recent fabrication in the face of a deportation order." United States v. Igbonwa , No. 90-375, slip. op. at 9 (E.D. Pa. Aug. 26, 1996). The court noted that Igbonwa had "presented the same testimony at a Rule 35 hearing in January, 1994, and again at a hearing on his petition for a writ of habeas corpus in February, 1995, long before the INS began deportation proceedings." Id. Thus, the court found as facts that Igbonwa had expressed concerns regarding his deportation to Jarvis, that Jarvis responded to these concerns with a promise that the "United States would take steps to prevent Mr. Igbonwa's deportation, and that Igbonwa reasonably relied on this promise before agreeing to plead guilty." Id .

The record, however, does not support many of the indicia of reliability and credibility that the district court accepted in evaluating Igbonwa's testimony. First, the investigation into the deportation proceeding actually began in 1993, as evidenced by the detainer notice sent to the warden of FCI-Oakdale on August 5, 1993. Thus, although it is correct, as the district court found, that Igbonwa's claim arose before the official "deportation proceedings" had begun, the investigation had been progressing for some time when Igbonwa first raised this alleged promise. Additionally, a similar investigation had been initiated as early as 1989, but was halted when the criminal proceedings against Igbonwa commenced. Thus, it is likely that Igbonwa was aware of the investigation into his deportability long before the official deportation proceedings began in late 1995.

Additionally, it is unclear when Igbonwafirst raised this alleged promise. The district court found that Igbonwa first raised this promise at a January 1994 hearing. The record reflects that Igbonwa did not state at this hearing that any promise not to deport him was made. Specifically, Igbonwa said that he turned down the Government's offer to place him in the Witness Protection Program, because the threat

to his safety was in Nigeria, not in the United States. But he did not assert that the United States Attorney's Office had promised him that he would not be deported by any branch of the United States Government.

At the February 1995 hearing on Igbonwa's § 2255 motion, Igbonwa first stated that he had not been permitted to participate in any of the negotiations related to the plea agreement. Later, Igbonwa asserted that the non-deportation promise was made to him in the larger context of discussions regarding the Witness Protection Program. However, Igbonwa also acknowledged that Jarvis told him that United States Attorney's Office would not be able to prevent his deportation, stating: "I said for the record that [Jarvis] told me Franklin, we cannot be able to save you against deportation. . . . He said Franklin, we the United States Attorney's Office cannot be able to save you from being deported by the INS." Igbonwa's claim that an INS agent, Jim Martinelli, echoed Jarvis' promise was not raised in his initial § 2255 motion and Igbonwa only raised it after Jarvis testified that Martinelli was one of the INS agents who communicated with Igbonwa during the proffer sessions.[3] Thus, the evidence relied upon by the district court is simply insufficient to support the finding that AUSA Jarvis had promised Igbonwa that the Government would not deport him.

Moreover, all other evidence in the case establishes that this alleged promise of non-deportation was never made. The written plea agreement does not include the alleged

_____

3. Even the language that Igbonwa attributes to Jarvis regarding the non-deportation promise -- "we can work with that" -- is language he previously attributed to Jarvis on a sentencing issue. In a letter to his former attorney, Daniel Alva, Igbonwa wrote:

"Then I asked openly what I stand to gain if I go to the Grand Jury. Then Mr. Jarvis asked me what I would want and you (Alva) gave me go ahead to say what I want. I then said that I would want "time served", and Mr. Jarvis said "at worst?", and I said "or a three yr. sentence". Mr. Jarvis indeed nodded in agreement and further stated "we can work with that".

Nowhere in the letter does Igbonwa refer to any alleged promises made pertaining to deportation.

10

promise; on the contrary, it contains a specific provision establishing that all promises made in connection with the agreement are within the four corners of the document and that no additional promises would be entered into"unless in writing and signed by all parties." Both Jarvis and Igbonwa's attorney testified that the alleged promise was never made during any of the proffer sessions. The district court's finding that Igbonwa feared deportation and that he mentioned those fears to Jarvis does not establish that the promise was made.4 Thus, the great weight of the evidence supports the conclusion that no such promise was made, and the district court's factual finding that the promise was made in the face of all the evidence to the contrary is clearly erroneous.

C.

The Government further argues that the district court erred when it found that the AUSA who allegedly made this promise regarding deportation to Igbonwa had the authority to bind other branches of the United States Government, specifically INS. This issue raises a question of law and accordingly our review is plenary. Graham v. Immigration & Naturalization Service, 998 F.2d 194, 194 (3d Cir. 1993).

The authority of a federal prosecuting attorney peremptorily to bind another department of the Government presents an issue of first impression in our court. The courts which have addressed this issue have split on the question of whether a United States Attorney or

_____

4. The dissent expresses the fear that the majority "condemns [appellant] to a substantial risk of death resulting directly from his cooperation with the United States government." Dissent op. at 19 n.6. This is a highly speculative conclusion, attributable solely to Igbonwa's self-serving testimony to escape deportation. Moreover, the United States does not and cannot serve as a safe-haven for every deportable alien who alleges that he may be killed if he is returned to his native country as a result of his criminal activity. If Igbonwa truly fears for his safety upon his return to Nigeria, we suggest that Igbonwa request that the Attorney General deport him to another country that would afford him greater protection from these alleged threats. See generally 8 U.S.C. § 1253 (Supp. 1997) (governing country to which alien will be deported).

11

his or her assistant can make a promise regarding deportation matters which will be binding on the entire United States Government. The Eighth and Ninth Circuits have both ruled that a federal prosecuting attorney who makes a promise of non-deportation during the course of a plea agreement has authority to bind INS and that this promise is enforceable against INS. See Margalli-Olvera v. Immigration & Naturalization Service, 43 F.3d 345, 354 (8th Cir. 1994); Thomas v. Immigration & Naturalization Service, 35 F.3d 1332, 1343 (9th Cir. 1994). The Eleventh Circuit, however, has ruled that an AUSA does not have the authority to make a non-deportation promise as part of plea agreement. See San Pedro v. Immigration & Naturalization Service, 79 F.3d 1065, 1072 (11th Cir.), cert. denied, 117 S. Ct. 431 (1996).5

In Thomas, the alien entered into a plea agreement with a United States Attorney which specifically stated that "the United States of America (hereafter "Government," which term includes its departments, officers, agents and agencies) . . . will not oppose any motions made by your counsel for reduction of sentence, modification or relief from deportation to the Court, parole commission and U.S. Immigration Service." 35 F.3d at 1335 n.1. The alien sought specific performance of this plea agreement, and INS argued that it was not bound by this promise made by a United States Attorney. 35 F.3d at 1135. The Ninth Circuit first noted that actual authority, either express or implied, is necessary to bind the United States Government; estoppel and apparent authority generally will not suffice. Id. at 1336. The court acknowledged that the United States Attorney had statutory authority to "prosecute for all offenses against the United States." Id. at 1338-39. From this express grant of authority, the court held that, under

_____

5. It is perhaps worth noting that all three of these cases are distinguishable from the case sub judice in that written promises were included in the plea agreement. See San Pedro , 79 F.3d at 1067 n.1 ("United States agrees . . . not to prosecute[alien] for any other offenses"); Margalli-Olvera, 43 F.3d at 348 ("United States will recommend against deportation"); Thomas, 35 F.3d at 1335-36 n.1 ("Government will not oppose any motions made . .. [for] relief from deportation").

principles of agency law, this granted the United States Attorney the "implied authority" to enter plea agreements, and that this implied authority bound the Government as a whole. Id. at 1340. Additionally, the court considered its conclusion bolstered by the Attorney General's supervisory power over both agencies. Id. at 1340-41.

In Margalli-Olvera, the alien entered a plea agreement which stated, in pertinent part, that "if the defendant participates fully and truthfully in a debriefing,. . . the United States will recommend against deportation. Otherwise, the United States will remain silent regarding deportation." 43 F.3d at 348. The Board of Immigration Appeals (BIA) affirmed the immigration judge's refusal to enforce this promise and upheld the order of deportation. Id. at 349. Upon petition for review, the Eighth Circuit held "that, if unambiguous, the term `United States' is a reference to the entire United States government and all the agencies thereof." Id. at 352. The court then followed the reasoning of Thomas and agreed that "the express grant of `authority to "prosecute" implies the power to make plea agreements incidental to the prosecution.' " Id. at 353 (quoting Thomas, 35 F.3d at 1339). Accordingly, the court held that "an Assistant United States Attorney has actual authority to bind the INS." Id. at 354.

Most recently, in San Pedro, an alien sought specific performance of a promise in the plea agreement not to prosecute the alien for any other offenses, which he asserted included a promise not to deport him. 79 F.3d at 1067. The district court found that this promise did not bind INS and thus was not enforceable. Id. at 1068. On appeal, the Eleventh Circuit agreed with Thomas and Margalli-Olvera that only actual authority would bind the Government. Id. at 1068. However, the Ninth Circuit found that the United States Attorney's Office did not have actual authority to bind the INS. Id. at 1071. The Eleventh Circuit considered the specific delegations of power to the United States Attorney's Office and to INS, and concluded that the United States Attorney's Office would only have the power to bind INS if the Attorney General specifically delegated that power. Id. at 1070. The court found no such delegation of this power, and held that a United States Attorney did

13

not have the authority to bind INS by a promise of non-deportation made in a plea agreement. Id. at 1072.

After careful consideration, this court finds the reasoning of San Pedro, which considered the specific nature of the statutes delegating immigration matters to INS and criminal matters to the United States Attorney's Office, more persuasive than that of Thomas and Margalli-Olvera, which considered the general power the Attorney General has over

both these agencies. To hold otherwise would grant United States Attorneys the power to bind any and every governmental agency under the supervision of the Attorney General through promises made in the plea agreement. We hold that this result does not adhere under either statutory law or through application of the ordinary principles of agency law, and that a promise made by the United States Attorney's Office relating to deportation does not bind the INS without explicit authority from the INS.

Bolstering our conclusion, the Eighth Circuit recently returned to this issue in United States v. Camacho-Bordes, 94 F.3d 1168 (8th Cir. 1996). In that case, the plea agreement stated that the Government would recommend against deportation to the INS. The Eighth Circuit concluded that, unlike Margalli-Olvera, which referred to the "United States" in the plea agreement and did not distinguish between the different agencies involved, the distinction between the Government (meaning the United States Attorney's Office) and the INS was clearly drawn. Camacho-Bordes, 94 F.3d at 1175. Thus, any agreement on the part of the Government obviously did not bind INS. Id. This is analogous to the present matter, in which even Igbonwa acknowledged that he knew AUSA Jarvis was speaking only for the United States Attorney's Office and not for INS. At the hearing on the § 2255 motion, Igbonwa testified: "[Jarvis] said Franklin, we the United States Attorney's Office cannot be able to save you from being deported by the INS." United States v. Igbonwa, No. 90-375, Feb. 8, 1995 Hearing Transcript at 91. Accordingly, we hold that the United States Attorney's Office lacks the authority to make a promise pertaining to deportation in the prosecution of a criminal matter that will bind INS without its express authorization. With formal authorization from

14

the INS, the United States Attorney might be able to promise non-deportation. These circumstances do not exist here because of the informal verbal nature of the alleged promise and Igbonwa's admission that AUSA Jarvis was speaking only for the U.S. attorney's office.

III.

The decision of a district court to refuse a motion for release on a defendant's own recognizance is reviewed under an extremely deferential standard. The district court's decision is presumed correct, and that presumption can only be overcome by special circumstances. Hilton v. Braunskill, 481 U.S. 770, 774, 107 S. Ct. 2113, 95 L. Ed. 2d 724 (1987) (citing Fed. R. App. P. 23(d)). No such special circumstances are present in this case, and the district court's order denying Igbonwa's motion for release on his own recognizance pending final resolution of this matter will be affirmed.

IV.

For the foregoing reasons, the order of the district court granting Igbonwa's motion and ordering the United States to specifically perform an alleged promise not to deport Igbonwa will be reversed. The order denying Igbonwa's motion for release pending resolution of these proceedings will be affirmed.

15

ALITO, Circuit Judge, dissenting.

I dissent for two reasons. First, I cannot agree with the majority that the district court committed clear error when it credited Igbonwa's testimony that he was promised that the United States would "take steps to prevent" his deportation to Nigeria. See App. 650a. Second, without clarification from the district court regarding the precise nature of its finding, I am unwilling to conclude that the Assistant United States Attorney in question lacked the authority to make the promise that the district court found was made. Specifically, if, as the government itself suggests (see Govt. Br. at 36 n.18), the Assistant United States Attorney merely promised that his office would make its best effort to prevent Igbonwa's deportation, it is by no means clear to me that the Assistant United States Attorney exceeded his authority in making the promise that he did.

1. Before addressing these questions, however, I will briefly discuss what the government characterizes as a threshold jurisdictional argument, i.e., that section 306(g) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, Div. C. Title III, § 306(g), 110 Stat. 3009, codified as 8 U.S.C. § 1252(g), retroactively divested the district court of jurisdiction and therefore requires reversal here. Section 306(g) provides:

Except as provided in this section and notwithstanding any other provision of law, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

8 U.S.C. § 1252(g)(emphasis added). Section 306(c) of the IIRIRA states that section 306(g) "shall apply without limitation to claims arising from all past, pending, or future exclusion, deportation, or removal proceedings under the Act" (emphasis added).

These provisions might assist the government were it not for the fact that the district court's final order was signed

16

on August 26, 1996, more than a month before the IIRIRA was enacted on September 30, 1996.1 Both of the statutory provisions quoted above used the future tense ("shall have" and "shall apply"). Thus, they at most affect the jurisdiction of the courts beginning the moment after the IIRIRA became law. Consequently, the statutory language does not support -- on the contrary, it undermines -- the government's contention that the IIRIRA retroactively divested the district court of jurisdiction over a proceeding that was already completed at the district court level.

The government contends that the IIRIRA prospectively divested us of jurisdiction to hear this appeal. See Reply Br. at 8 ("this Court has no jurisdiction over this case"). However, merely showing that this court was prospectively divested of jurisdiction (as opposed to showing that the district court was retroactively divested of jurisdiction) would not help the government, since the government is the party that has appealed from and seeks reversal of the district court's order directing the United States to "take steps" to prevent Igbonwa's deportation to Nigeria. (In any event, the language of section 306(g) affects only appeals brought "by or on behalf of [an] alien.").

Even if section 306(g) did not evidence a clear congressional intent not to divest the courts retroactively of jurisdiction over actions in which they had already entered final orders, the presumption of non-retroactivity leads to the same conclusion. See Landgraf v. USI Film Products, 511 U.S. 244, 293 (1994) (Scalia, J., concurring in judgments) ("applying a jurisdiction-eliminating statute to undo past judicial action would be applying it retroactively").2

2. I cannot agree with the majority that the district court committed clear error in finding that the prosecutor promised Igbonwa that "the United States would take steps to prevent his deportation." App. 650a. Igbonwa gave testimony to this effect, and the district court expressly

_____

1. The government also filed its notice of appeal (on September 24, 1996) prior to the enactment of the IIRIRA.

2. The government itself quotes and relies on this very passage. See Govt. Br. at 22 n.12.

17

found his testimony to be "credible."3 Id. In making this finding, the district court judge relied on the knowledge he had gained by virtue of his "six-year oversight of these proceedings" (id.), which included numerous opportunities to speak with and observe Igbonwa personally. There is no doubt that the printed record contains evidence that supports a contrary finding, and if I had been the district court judge, I am not at all sure that I would have believed Igbonwa's testimony. But I cannot say that the district court's finding, which rests heavily on a credibility determination, was clearly erroneous.

3. While I accept the district court's finding, I view it as ambiguous in a way that may have important legal implications. As noted, the district court found that "the United States [promised that it] would take steps to prevent [Igbonwa's] deportation." App. 650a (emphasis added). Similarly, the district court ordered the United States to "take steps to prevent the defendant's deportation." App. 661a (emphasis added).

One possible interpretation of the district court'sfinding is that the United States promised to take whatever administrative steps were necessary to prevent Igbonwa's deportation. If this is the correct interpretation, then we might be required to confront4 the government's arguments (a) that under 8 U.S.C. § 1105a(c), the district court was precluded from entertaining Igbonwa's motion because he had not exhausted his administrative remedies and (b) that the Assistant United States Attorney who allegedly made

_____

3. In a nutshell, Igbonwa's story is that he feared that his cooperation with the United States, in its prosecution of the members of a Nigerian drug ring, would put him in danger of "violent reprisal" should he ever have to return to Nigeria. Id. at 648-650. Given these fears, Igbonwa claims that he requested the United States government to grant him -- in exchange for his cooperation -- a promise that they would protect him from deportation to Nigeria.

4. Igbonwa argues that we should not consider the government's legal arguments because they were not presented to the district court. I express no view at this time regarding this question.

18

the promise to Igbonwa lacked the authority to make a binding commitment regarding deportation.5

Another possible interpretation of the district court's finding is that the Assistant United States Attorney simply promised that his office would make its best effort to persuade those having the decisionmaking authority that Igbonwa should not be deported to Nigeria. Under this interpretation, the Assistant United States Attorney's promise would be similar to a promise to recommend a sentence to a sentencing judge who is then free to impose whatever lawful sentence the judge finds appropriate. Under this interpretation, I am not at all sure that either of the legal arguments noted above would be implicated, and in any event, the issues might be significantly altered. Accordingly, before confronting those difficult issues, I would remand for the district court to clarify itsfinding.

For these reasons, I cannot join the decision of the majority, and must respectfully dissent.6

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

_____

5. Igbonwa contends that, even if the Assistant United States Attorney lacked authority to make such a promise, an Immigration and Naturalization Service agent who attended one of the critical meetings with Igbonwa possessed such authority.

6. The stakes here are high. If the district court was correct in finding Igbonwa credible, then the majority's reversal condemns him to a substantial risk of death resulting directly from his cooperation with the government. I reiterate, therefore, that I would not reverse the district court, but, instead, vacate its order and remand the case for clarification.